Good morning, Counsel. Good morning, Your Honor. And may it please the Court, Parole sent for Defendant Appellant Thomas Cornelius. And I would like to reserve three minutes for rebuttal, if I may. Just watch your time. The time on the clock is your remaining total time. Thank you, Your Honor. All right. And I do intend to spend most, if not all, of my time talking about the Maine suppression issue and the first case that was briefed in the brief. And, of course, answer any other questions that the Court may have regarding the other issues. Yesterday I provided the Court with a 28-day letter citing to the Rodriguez decision, a Supreme Court case from two years ago, that I think basically reiterated some longstanding principles regarding traffic stops. And the fundamental takeaway from that decision is, once the officer has completed, has established and completed all steps relating to the purpose of the traffic stop, including horn checks, name checks, vehicle checks, those sorts of things, and has issued the citation, the stop must end. Unless? Unless there's reasonable suspicion. But I cited that case just to establish the principle that there can be no other de minimis delineating of the stop, prolonging of the stop, unless there is that reasonable suspicion. So that brings us to the issue of whether or not there was reasonable suspicion as articulated by the officer who initiated the stop. Absolutely. That is the main issue here, Your Honor. And what the court found, and the district court below, relied on a number of different factors. And they all kind of centered around Trooper Gardner's initial contact with the defendant at his window there, at his vehicle. There was the issue of the incorrect address, or not being able to relay the complete address. A question of whether he had permission to drive his vehicle, whether he was in violation of his probation for traveling out of state. And his general demeanor, I think, is essentially what Trooper Gardner and what the court relied on in talking about this. This all gives rise to reasonable suspicion. I don't want to concede, but it does. And what I would characterize all of this stuff, and I dissected it in greater detail in a brief, is a number of speculative issues. Could he have traveled out of state without permission? Well, it's possible. He denied it. She did not confirm it. Did he intentionally give it a wrong address? Well, it's possible, I suppose. But he did identify the street, town, and three digits of his address. Well, if someone doesn't know his address, isn't that a suspicion? Something stands for an officer if one is asked for his address and he doesn't know his address. Not necessarily, Your Honor. Not necessarily, but it could be. In the abstract, it could be. But in this case, what Mr. Cordialis was able to say, and I don't have the numbers at hand, but he identified three out of the five digits of his address. He had identified it on Green Acres Road or whatever in Coon's Bay. And importantly, the officer then went back and he said that he had just recently moved. So he had not yet gotten the new ID with that new address on it. But what he also said is, I called the DMV and I told them about my new address. And this gets to the important part here, Your Honor, that I think the district court has met, is the issue of dissipation. Because what happens is, then, as the officer, our chipper guarder, then goes back to her vehicle, it's 255. Between 255 and roughly 3 o'clock, she calls dispatch, and a number of things are confirmed to her. She learns that he did, in fact, report an address change and that his new address is very consistent with what he thought it was, just two digits off. They confirm that he did have a valid driver's license and they also, she inquired about the license plate. And by the time that that conversation with dispatch, the whole transaction was over with, dispatch said that this car is not a stolen car. So she had no reason to believe, no reasonable suspicion to believe that the car was stolen. Well, I mean, dispatch reported that. They had no report that it was stolen. But that was dispatch. You know, all he does know is stolen and not a valid license. Well. That just reports what he receives. And I received a report that it was stolen. I heard him officer. Yes, but when you look at the transcript from chipper guarder's testimony, and it's in the actual record from roughly ER 321 to 325, she kind of talks about, generally speaking, she can rely on calling dispatch, and if a car is reported as stolen, it's reported stolen fairly quickly. And it gets them to their system. Now it's not a hundred percent. But also, except you're dealing here with a rental car, right? Sorry? You're dealing here with a rental car. Yes. And, you know, I might fall into a different category here. It's not, he had no proof that it was, he had no receipt, no real contract, nothing like that, right? That's right. I mean, is that reasonable suspicion? To investigate that aspect further. The question I would ask is reasonable suspicion of what? Reasonable suspicion. If he got off right now, that's all right. Well, but to what lengths may an officer go then to investigate that? Well, I'm saying from the moment they found out, she found out, the trooper, I always thought all that long. In other words, you have to remember, she was, you know, handling two people at the same time. I thought it was the other driver in another car that she had to deal with. Right. So that's the issue. And then from this point of view, too, so, you know, you have to take that into account when you're making your timeline. Well, absolutely. But the timeline as it occurred here is, you know, she first encounters Mr. Cornelius, learns these things, and stops briefly at Mr. Holmes' door. She testifies that she asked him, were you speed racing with this other guy? He says no. So she's investigating whether they were speed racing. She goes back to the car, and from five to three, until roughly three is where she's talking to dispatch. Now, she cannot rule out the possibility. So then, so, again, my contention is, if she's done everything that she can do to investigate what the traffic offense is, and she has also learned from dispatch what she can learn regarding this defendant, most of it checks out. She can't absolutely rule out the possibility that this car was stolen, but I don't believe that's the standard for what reasonable suspicion is all about. Now, at some point, you know, you call dispatch and rely on what they say. You confirm the details. You confirm a lot of things that he is telling that is the truth, including the fact that he's on probation, including the crimes that he was on probation for. He said he doesn't have any stipulations. I don't know what stipulations means, but for whatever reason, she's able to confirm that with dispatch as well within that very short period of time. So reasonable suspicion comes down to the totality of circumstances, and what I submit that district court missed here is she talked about the things that gave rise to reasonable suspicion when Trooper Garner was at Mr. Cornelius' door. What the court did not address was those things that she found out from dispatch that really removed the quantum of evidence, if you will, necessary to establish reasonable suspicion to the extent that it existed before. Now, with respect to the other driver, so, yes, she was dealing with two drivers at the same time, but her view, of course, is that at 3 o'clock, when she knows everything that she needs to know regarding issues of citation, she simply should have issued that citation to Mr. Cornelius and let him go because she had no other basis to hold him, and then she could have shifted her focus to the DUI driver as she did. And so, if an officer in this situation were to have some kind of hunch or suspicion or thought that something here is not quite right, it has to be a reasonable suspicion that gives rise to and they must be able to articulate facts that give rise to a reasonable suspicion that a crime has been committed or is being committed or is about to be committed. And all this just doesn't add up to that in this instance. What we have here is just a series of things that may have caused her momentarily concern, such as the backing up of the vehicle, reaching into the bag. Well, he reached into the bag when she was asking him questions about the car rental papers, so one would expect one to reach into a bag when something like that happens. And, again, he doesn't pull out a weapon, so her concern dissipates because he doesn't pull out a weapon. And so what we have here is just a series of things that may have caused her momentary concern, perhaps his status as a felon, a probationer, caused her to want to investigate this further, but that doesn't itself give rise to a reasonable suspicion that criminal activity is afoot. And so I dissected all those issues in some great detail in my brief. She's suspicious of something. She doesn't know exactly what, and it keeps shifting throughout the government's presentation in this case. And I also, you know, did he violate parole by leaving the state? Again, this was another issue that maybe she suspected that. I agree with you that, you know, all of these suspicious circumstances that arose during the course of her interrogation as a defendant, over a short period of time, these problems did dissipate, except for the one about the car. Well, I guess my main point on that would be the fact that somebody doesn't have proof of ownership or proof of permissive use of a vehicle in and of itself does not give rise to a reasonable suspicion that they stole a car in any way that's sufficient to justify a continued detention of the individual. You know, maybe she wanted to investigate him, but that doesn't mean that she can continue to hold him in order to conduct that investigation. And I could give you a potential object to interject a question. What is the significance of the fact that the officer thought that Cornelius and Loma had been speed racing and that the miles per hour estimated was extremely high? Is that significant? How long is she in question? Well, I don't believe it is. I'm relying primarily on her testimony about that because I don't recall her ever testifying that that was something that, I mean, she did suspect that and she investigated that because she was asking both Mr. Cornelius as well as Mr. Holm about that, whether they knew each other, whether they were competing, whether they were speed racing, and they both denied it. And so she was left with, you know, and this came out in her testimony, by 258, after having spoken with both of them about that, she knew what it is that she needed to cite Mr. Cornelius for, which was just simply a violation of the basic rules. Do you think she has to cite him, let him drive away, before she takes a sobriety test on the other guy? Yes. And it's because, you know, and whether it's a sobriety test or anything else that she might have, some other tasks that she might have there, the key thing from the Rodriguez decision is, you know, once she has completed all steps of the investigation relating to the traffic stop, and once she has done the warrant checks, the name checks, and all that, then she has no choice but to let Mr. Cornelius go. There's no reason other than, of course, there's reasonable suspicion, but assuming that to be the case, there's no lawful basis to continue to hold Mr. Cornelius. She has to let him go. And, you know, I mentioned that it is difficult for officers that have two people stopped to have to deal with both stops at the same time. And if she were, in fact, working on her tasks relating solely to the purpose of the stop the whole time, then it would be a different scenario. But she was pretty unequivocal in her testimony that by 258, she'd made up her mind as to what the traffic violation was. And she was also clear that the reason she held him was because she wanted to continue the investigation into what she believed were potentially criminal matters. So it was not just, it wasn't a secret purpose. It wasn't some other reason other than to hold somebody for a law enforcement investigation. That's why it was unlawful. Thank you, Coach. Did you want to say that that was a good time for a photo? Absolutely. I'll do that. Thank you. Please support my own strength and integrity. As prosecutors, not all of these cases will be responsible for all of these cases. The issue that was raised earlier, this is more on behalf of his client as a suppression issue. He mentioned in Rodriguez's case that Justice Ginsburg wrote. In that case, Justice Ginsburg was careful to point out that absent reasonable suspicion of criminal activity or concern for officer safety, an officer cannot be deemed a citizen if he sits around for criminal evidence. That's not what we have in this case. Judge Aiken, the district court judge, found that during those three minutes for her stop, by the way, it was the second driver stopped, the first person contacted was Mr. Holm, that she did not have reasonable suspicion. It was based upon the totality of the circumstances. She had, that's the best question. The car rental papers that you mentioned is probably the primary concern. What you have here is the video tape that has the audio up to the point where it goes out and it's clear. And as she does what a typical traffic officer would do, time two, there are actually three vehicles that we recall from the video. As she was trying to stop forward, she's suspected to be speed racing. As Justice Gould points out, the speeds were quite high. The first car below was the Cadillac of Mr. Holm, and the second one was the fence car. Now, clearly that car is significant because it goes on the officer's safety. Unlike the Cadillac, Mr. Cornelius made her stand out in the middle of Highway 101, if you will. The video shows that, that she's in a street view on the bottom of it. So, initially she has concern for her safety. That in itself is not enough. Now, as she asks the questions, what happens next? Well, license, registration, insurance. Well, the license, I don't know my address. She says, oh, I see what you're talking about. You know what I mean? She says, the folks in the city would be kind of dissipating themselves all the time. And everything, you know, she was suspicious about. She checked out, and it turned out he was correct, right? He was lying. You know, he didn't have any conditions on his parole. He was authorized to go out of town. You know, all these things, you know, turned out to be not aggressive. He was a little suspicious, right? It's law to dissipate. And she still held him for a period of time after that. She said, that's right. She didn't just give him a ticket. She wouldn't give him a ticket for driving without a proper authorization for the car or something like that. She didn't even, you know, she didn't have anybody call her out or anything like that. Right? She just, you know, kept talking to him because I think, obviously, once again, she would finally want the car. She still wanted to fetch his car. Well, she did. The chronology. Was that suspicious? Pardon me? At that point, there was no longer, you know, any suspicion, was there? Well, there was. What was that? Well, first of all, the suspicion was, was this felon doing it on a stake? No, that was all. She got the report that, yes, he had commissioned to do it on a stake. That was, well, plus the chronology, and then I'll explain my answer. That's what Judge Aiken went through. The car stopped. During that interview, do you have a license? Yes, but my address is incorrect. That's never confirmed until later when the address is different. You don't have to go through the whole thing. We've been through it with him. You know that already. But the point is, at some point, all that was resolved. At some point. There was nothing else to do, but she still kept him interested and said, all right, I'm going to go. Right. What was the officer's safety? Well, what was the safety issue? Well, there was a reasonable suspicion of my officer's safety. What was that? No, that's the chronology that Judge Aiken went through. Well, what was the officer's safety issue that remained? She stops the vehicle. We're in parks. I don't know what issue remained at that point. That she didn't back up. That's why she asked for it. Once she found out, it was an armed criminal judge. If you look at the dispatch, the chronology, I keep going back to Judge Cashman. You know where there's an Hernandez case, Judge Cashman. She did get an early back-up report, didn't she, from Quail? Yes and no. I don't know, Judge, if you want to be a police officer dealing with a person who's a total armed criminal, have a tribal officer who may or may not have armed a security officer for a casino who is watching you do the Phil sobriety test. This gets back to the question you asked, is the duration of this stop reasonable under the totality of circumstances? And Judge Aiken said, yes, it was. And the government had really two strong arguments. The first was a reasonable suspicion. Mr. Olsen says it dissipates. It doesn't really dissipate. That's the problem. What happens is that as she's going through the questions where she's standing in the street, she reaches into a bag. Now, Mr. Olsen says in her report what it says, she thought he was looking for babies. But this was after she had already been told by Mr. Cornelius. But, you know, who would do this? You reach into the bag.  He didn't follow the weapon. He didn't follow the weapon. Well, that's gone. Right? It doesn't come out again. That basis just no longer exists. Yeah, that's my point. All these things were dissipated. They were taken care of. But at that point where she still kept him, kept him and continued him. But let's look at the cases and what we're doing with them. They're all gone. So, at that point, I ask you, what specifically made you say, well, he could have been armed? But there's no, you know, reasonable suspicion for that. They're taking me as a reason, as much as I said. I don't think they were reasonable. I'm questioning you about whether those reasons were good. I think they were. We submit they were. And, more importantly, we submit that if you look at her conduct, it indicates that she was concerned for officer safety. Once she found out that the dispatcher told her she was dealing with a potential armed criminal, what's the next thing she did? Ask her about it. Well, what do you think? When that kind of circumstance arises, an officer can keep a, you know, a driver at a stop in traffic. In custody forever? No. I'm going to make it very, very clear. It's just Ryan Hargrove's opinion. Just because someone's a felon, it's not a basis to detain them alone. And that's all you have here at that point? No. It's a secrecy practice. And I'm sorry, Judge Aiken. What we're saying was he's reaching into the bag. The circumstances of not telling the truth about the license. He reached into the sack of chips. He came out with a piece of paper. He didn't tell him anything. He didn't come out with a weapon, sir. He didn't tell him? No. He didn't tell him. You're saying he came into the bag. It's suspicious. The circumstances, you know, when she reached out, you know, when he comes out, he has no weapon. Correct. Right, like that's good. What I'm saying is all these things revolve themselves. And then at that point, she still kept them in custody. At that point, she was standing, waiting for the backup officer. She might have seen him, but she didn't let him go. At that point, she felt concerned for her safety. Okay. Because of our system. I don't know if I should mention this at all. The way in which she consented for it. There was no reasonable basis to be concerned for her safety. That's my point. Now, you go into the dry yard and say she's a felon. It's not a reason to say you're concerned for your safety. It is not. Why? Because he had her at that point. Because he brings her to the judge. Why? Because he had her at that point. When she stops the vehicle. And I'm going to this chronology. I'm going to this chronology. She did all of those things. In every circumstance. In every circumstance. She thought it was a good game. Right? It's a reasonable suspicion. You know, went away. Over time, it was all gone. Her concern for her safety did come. If she had let him go, then the concern would have dissipated. If he was gone, how could she be concerned for her safety? She didn't let him go at that point. That's interesting. During the course of the examination, Mr. Beckley, the second lawyer for Mr. Cornelius, Mr. Beckley asked the question, well, you drove off. Well, I'm concerned about your safety. You didn't take the keys out. All right. And she said, if you left, I wouldn't be concerned about my safety. The chronology that Judge Aiken found convincing, and I'm convinced it's convincing in this case, which distinguishes it from simply stopping a felon. He got out of state. He got out of state. No, but the question was, if she had let him go at that point, as Judge Tachibana was discussing with you, if she had let him go after everything had been resolved, how could her safety have been compromised at that point? Well, she would have had to write the citation. And so she would have been concerned while she was writing the citation. And if you look at the chronology, what happens is she has three minutes, which gives her a reasonable suspicion. Some of which dissipates as Judge Tachibana points out. Tachibana. Tachibana, excuse me. I've argued in front of you before, I should have noted. This is that point. Then what happens is she goes back and she finds out that she's dealing with a guy, an armed criminal. He doesn't have rental papers. He doesn't have the correct address. He's acting nervous. He's mixed into a bag. He's causing security concerns. So once she learns that he's a potential armed criminal, that's when she asks for backup. She's 15 minutes away. She doesn't stop her investigation and she should go back to him and try to sniff around for more evidence or question him any further. What she does is she deals with a second citizen. And that's what a shock case, the Turbin case, and Judge Gould's Hart's case, H-A-R-T-C, that I cite, are the cases that are most significant here. Because in each of those cases, we look at the totality of the circumstances in front of the officer. She has stopped two cars. The first one was a Cadillac. And we don't have a first stop, first serve policy, but we're looking at duration and results of duration of stop. But she's dealing with both of them. And you see, she officially does that according to Judge Aiken. She does that in no unnecessary delay. What she does, after she does the record check, and as Judge Tashima says, there's a dissipation of some of those things that concern her. She nevertheless asks for backup to come. She does one thing for two seconds and says, you know, you need to stay here. I'm going to go ask you some more questions. If you're righteous, I think that she leaves him immediately. And then she goes with the second driver. And when that's done, the backup arrives, and she immediately goes and asks for consent. So if you're looking at the total time she has with this defendant, it's about 8 to 12 minutes at most. If you're looking at the time she has with the other driver, it's about 18 minutes. And, Counselor, Judge Gould, if I could interject one question on a point that's been covered that I want to clarify something. She was concerned about his reaching into the bag. And I gather that some argue or the opponent is arguing that because he reached into the bag and didn't pull out a gun, so one can forget about that. My question is, does she know that there's no gun in the bag? Because someone could reach into a bag and, you know, pull out a plumb or a piece of paper, and there could still be a gun in that bag. Correct. In this instance, the video supports the officer's concern because as the white truck is approaching her, the white pickup truck, it goes off into the other lane and sights you at the exact time. What you see her do is move away from the driver's side door, put her right hand down near her sidearm, and she's looking and watching what Mr. Cornelius is doing, reaching into that bag. It's justified that most people, if you deal with them based on their training experience, take the bag, put it on their lap, open it up, and pull out whatever they need. The other concern is that he had already said he did not have the car rental papers when he reached into that bag. So what was he reaching for? In her report, as Mr. Olson points out, she thought he was reaching for some more papers to show where his address was. He didn't. And she testified these were all cumulative of the reasons why she was concerned for her safety. Now, sometimes officers say they're concerned for their safety and there's no reason for it, but here, as I pointed out, she called the dispatch to get the record check to determine some of these facts that she was suspicious about. When she learns this man was an armed criminal and she suspected he might have a gun in the bag, she didn't like where he parked because she had to cover her neck to see if he was reaching for something or if he was going to be trafficked. The nervousness he had, the fact that he'd been out of state and he was in a rental car, which the judge later noted, of course, wasn't supposed to be. It was supposed to be his personal vehicle. And he called her to immediately ask for backup. And this court repeatedly has held. And even in the hernia stage that Judge Tashima had, he said if there's a need for backup, if there's a reasonable need for backup, then prolonging the duration of the stop is a reasonable thing to do. And that's what Judge Aitken found in this case. And so we know that her actions isn't just a justification to prolong the stop. She actually immediately asked for a backup, officer. And as soon as the backup officer arrived, she finished her investigation with her home counter who had an equal right to have his stop no longer, the duration of his stop, to be officially done. And she immediately approached the defendant at this point. She only talked to him for two seconds after the three minutes where she had a reasonable suspicion and after she asked for backup. When the two of them approached the vehicle together, she asked for consent from the right-hand side. She said, hey, you should come back and sell me push bars. And that's when the two firearms were found at the front that were loaded and stolen. And a stun gun was found in the bag that he had reached into. Now hindsight is 20-20. It doesn't affect the decisions to whether her initial actions were reasonable. But certainly the duration stopped here, given the sharp decision, the turbulent decision, and Judge Gould's decision at hearts, I think, justified it. And Judge Aitken is still finding that this was a reasonable duration for the stop of two vehicles by a single trooper until another trooper could arrive to make sure she was safe. Now, that's an interesting issue. But the child court's factual findings are logical, plausible, and are supported by the record differences she drew. In her findings and her denial of the suppression motion should be upheld. Now I'm down to five minutes. I don't have to use all my time. This has been an interesting discussion. If there's any more questions I have, I'll be glad to entertain them. Thank you, Judge. Okay. Thank you, counsel. There was never any issue as to whether Trooper Garza needed backup in order to issue a citation to Mr. Corneas. That's never been an issue in this case. Counsel, I don't see no issues with that. Well, if that were the case, there was a moment in time before she did the DUI testing in Mr. Holm where she approached Mr. Cornelius and said, don't go anywhere, I'm going to issue a citation. So if she was concerned about the possible nut in that bag, why would she do that? And so her testimony, from her testimony, I believe it was quite clear that the reason she called for backup was because she intended to continue an investigation into Mr. Cornelius. It was not about having somebody there while she's issuing a citation to him. Now, the record will be, of her testimony, may be more clear on these points than what I'm about to say. I think she was, I think her general answer was she was concerned about her safety and the fact that she was dealing with two drivers. Yes. But the video shows that as of 3-0-1, so in other words, as she's beginning to do her field sobriety testing to Mr. Holm, the security person, the personnel from the casino are there because you can see them in the video. And I can't say when the earliest possible time is that Trooper Brandon arrives. Perhaps it's in the dispatch records that we have here in the executive record. But he comes into view in the video at 2-15. So in other words, while Trooper Gardner is still dealing with Mr. Holm. So if it's true that she was waiting for backup so she could safely issue a citation to Mr. Cornelius, then she should have done that when those people showed up. But upon completing her task with Mr. Holm, the next thing she does, according to her testimony, is tell Trooper Brandon that she suspects maybe there's guns in the car. And she goes and they do a consent search and issue a citation. So this whole thing about if she needed backup in order to issue a citation is just not consistent with the record and it's really not consistent with what Trooper Gardner said or the position that has been taken by the government up to this point in time. So, you know, again, the possibility of a gun in the bag, you know, her testimony was that people normally take a bag and put it in their lap. Now, maybe that's how people often do it, but I just think we can bring some common sense to this and just say, is that how everyone's going to do it? And the fact that somebody's reaching to the passenger seat to look inside to see if there's any papers in there, any documents that might have my address on it, that's not suspicious. That's just simply not suspicious. And an oral that's added up does not add up to reasonable suspicion, particularly when we take into consideration what Trooper Gardner heard from dispatch, which she learned in that period of time leading up to about 3 o'clock. Thank you. Thank you, team. Both council and business market is submitted for decision by the court. Thank you. This is our calendar for today. We are on recess until 9.30 a.m. tomorrow morning.
judges: Tashima, Gould, Rawlinson